IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DWAYNE M. WOODSON, #N-10392          )
                                     )
        Plaintiff,                   )
                                     )
                                     )
-vs-                                 )   13-CV-240-GPM
                                     )
PAT QUINN, et al.                    )
                                     )   The Honorable
        Defendants.                  )   G. Patrick Murphy
                                     )   U.S. District Judge

## AMENDED COMPLAINT

Plaintiff, DWAYNE M. WOODSON, pro-se, pursuant to the April 5, 2013 Order entered by U.S. District Court Judge G. Patrick Murphy (Doc. 5), submits his amended complaint to comport with FRCP, Rule 8(a)(2) and (d)(1).

In support that thereof, Plaintiff states as follows:

This is a Civil Rights Action filed by Dwayne M. Woodson, a state prisoner, seeking redress for deprivation of rights secured by the laws of the state of Illinois and the 8th amendments to the United States Constitution, pursuant to Title 42 U.S.C. §1983 seeking declaratory and injunctive relief and damages for deliberate indifference to his serious medical needs, harm, injuries and damage to his brain as a result of a hemorrhagic stroke, caused by the denial of adequate medical care, delay and interference with medical examinations and treatment and in combination with a series of inhumane conditions of confinement plaintiff was subjected to, where all these inhumane occurrences culminated, causing plaintiff to suffer harm, injuries and emotional and mental anguish.

# UNITED STATES DISTRICT COURT

for the

Southern District of Illinois

| | |
|---|---|
| DWAYNE M. WOODSON, N-10392 | ) Case Number: 13-CV-240-GPM |
| Plaintiff, | ) (Clerk's Office will provide) |
| Plaintiff/Petitioner(s) | ) ☒ CIVIL RIGHTS COMPLAINT |
| v. | ) pursuant to 42 U.S.C. §1983 (State Prisoner) |
| PAT QUINN, et al., | ) ☐ CIVIL RIGHTS COMPLAINT |
| | ) pursuant to 28 U.S.C. §1331 (Federal Prisoner) |
| Defendant's. | ) ☐ CIVIL COMPLAINT |
| Defendant/Respondent(s) | ) pursuant to the Federal Tort Claims Act. |
| | ) 28 U.S.C. §§1346, 2671-2680, or other law |

X Diversity Jurisdiction
  Pursuant to 28 U.S.C. §1332(a)

I.    JURISDICTION

Plaintiff:

A.   Plaintiff's mailing address, register number, and present place of confinement. Dwayne M. Woodson, Reg. No. N-10392, P.O. Box 1000, Menard, IL 62259-1000 Menard Correctional Center,

Defendant #1:

B.   Defendant Pat Quinn, Governor _____ is employed as
            (a)    (Name of First Defendant)

Honorable Governor of the State of Illinois
            (b)         (Position/Title)

with  the State of Illinois, at 207 State House,
            (c)     (Employer's Name and Address)

Springfield, Illinois 62706

At the time the claim(s) alleged this complaint arose, was Defendant #1 employed by the state, local, or federal government?   ☒ Yes    ☐ No

If your answer is YES, briefly explain: The Honorable Pat Quinn was the Governor of the State of Illinois as the appointee, successor and elected officer. Defendant Quinn is being sued in his official capacity for injunctive relief for the ongoing and continuing unlawful conditions of confinement, and the unlawful policies, practices and customs in maintaining overcrowded prison population.

**Defendant #2:**

C.   Defendant _____Salvador Godinez_____ is employed as

(Name of Second Defendant)

the current Director of the Illinois Dept. of
Corrections

(Position/Title)

with   the State of Illinois, at 1301 Concordia Court,

(Employer's Name and Address)

P.O. Box 19277, Springfield, IL 62791-9277

At the time the claim(s) alleged in this complaint arose, was Defendant #2
employed by the state, local, or federal government?   ☐ Yes   ☒ No

If you answer is YES, briefly explain: Defendant Godinez is being
sued in his official capacities for injunctive relief
for the ongoing and continuing unlawful conditions of
confinement, and the unlawful policies, practices and
customs in maintaining an overcrowding prison popula-
tion.

**Additional Defendant(s) (if any):**

D.   Using the outline set forth above, identify any additional Defendant(s).
     Defendant Michael P. Randle is and/or was employed as
     the Director of IDOC with the State of Illinois, at
     1301 Concordia Court, P.O. Box 19277 Springfield, IL
     62794 and is sued in his official and individual
     capacities for maintaining overcrowded conditions and
     excessive lockdown causing harm and damages to Plaintiff.

E.   Defendant Gladyes Taylor was the Acting Director and/or
     Director of IDOC in the early portion of 2010 with the
     State of Illinois, IDOC at 1301 Concordia Court, P.O.
     Box 19277, Springfield, IL 62794 and is sued in her
     individual and official capacities.

F.   Defendant Demetris Gaetz was emploed as the Warden at
     MCC and Deputy Assistant for the District where MCC is
     located with the State of Illinois, IDOC at 1301 Concordia
     Court, P.O. Box 19277, Springfield, IL 62794 and is sued
     in his individual and officials capacities.

G. David Redour was employed as the Warden at MCC in 2010 and 2011 with the IDOC, State of Illinois, at 711 Kaskaskia Street, P.O. Box 711, Menard, Illinois 62259 and is sued in his individual and official capacities for maintaining a series of policies, customs and practices that were unlawful and inhuman conditions of confinement. Plaintiff seeks damages for the deliberated indifference to his serious medical needs, harm and injurious.

H. Assistant Warden Richard Harrington was employed as Asst. Warden of Operation at MCC in 2010 with the IDOC, State of Illinois, at 711 Kaskaskia Street, P.O. Box 711, Menard, Illinois 62259 and is sued in his individual and official capacities for maintaining a series of policies, customs and practices that were unlawful and inhuman conditions of confinement. Plaintiff seeks damages for the the deliberated indifference to his serious medical needs, harm and injurious.

I. Shannis Stocks was employed as Assistant Warden of Programs at MCC in 2010 with the IDOC, State of Illinois 62259 and is sued in his individual and official capacities for maintaining a series of policies, customs and practices that were unlawful  and inhuman conditions of confinement. Plaintiff seeks damages for the deliberated indifference to his serious medical needs, harm and injurious.

J. Major Inman (First Name Unknown) was employed as a Correctional Major at MCC in 2010 with the IDOC, State of Illinois, 711 Kaskaskia Street, P.O. Box 711, Menard, Illinois 62259 and is sued in his individual and official capacitices for his deliberated indifference to Plaintiff serious medical needs, harm and injurious.

K. John or Jane Doe's (Lockdown Coordinators) were employed as Correctional Majors or above (First Names & Last Names Unknown) at MCC in 2010 and 2011 with the IDOC, State of Illinois, 711 Kaskaskia Street, P.O. Box 711, Menard, Illinois 62259 and is sued in their individual and official capacities for their deliberated indifference to Plaintiff serious medical needs, harm and injurious.

L. Wexford Health Sources,  Inc., was employed as a Contractor/Vendor with the IDOC to provide services at the MCC. They are located a 425 Holiday Drive, Foster Plaza Two, Pittsburgh, PA 15220. Based on information and belief, Wexford is incorporated in the state of Florida, and is sued in their individual and official capacities for the delibertated indifference to Plaintiff serious medical needs, harm and injurious.

M. Kevin C. Halloran was the CEO, President (with 9% ownership interest) for Wexford Health Sources, located at 425 Holiday Drive, Foster Plaza Two, Pittsburgh, PA 15220 as a Contractor/Vendor with the IDOC to provide services at the MCC, and is sued in his individual and official capacities for deliberated indifference to Plaintiff serious medical needs, harm and injurious.

-2A-

N.  Defendant Daniel Conn and/or a (John or Jane Doe Vice President & CFO) was the Vice President & CFO with Wexford Health Sources, Inc., locate at 425 Holiday Drive, Foster Plaza Two, Pittsburgh, PA, 15220, and employes as Contractor/Vendor with the IDOC to provide services at the MCC, and is sued in their individual and official capacities for deliberate indifference to plaintiffs' seriou medical needs, harm and injuries.

O.  Defendant Norm McCain, and/or a (John or Jane Doe, Owner of Wexford Health Sources, Inc.) was an owner of Wexford Health Sources, Inc., (with 81% proportinate share of the ownership interest) located at 425 Holiday Drive, Foster Plaza Two, Pittsburgh, PA 15220, and employed as Contractor/Vendor with the IDOC to provide services at the MCC, and is sued in their individaul and official capacties for deliberate indifference to plaintiffs' serious medical needs, harm and injuries.

P.  Defendant Dr. Arthur Funk was and/or is Regional Medical Director for Wexford Health Sources, Inc., located at 425 Holiday Drive, Foster Plaza Two, Pittsburgh, PA 15220 and employed as Contractor/Vendor with the IDOC to provide services at the MCC, and is sued in his individual and official capacities for deliberate indifference to plaintiffs' serious medical needs, harm and injuries.

Q.  Defendant Dr. Louis Shicker was and/or is the IDOC Agency Medical Director in 2010 with the State of Illinois, at 1301 Concordia Court, P.O. Box 19277, Springfield, IL 62794, and responsible for adequate medical care services and needs are provided at the MCC, and is sued in his individual and official to plaintiff serious medical needs, harm and injuries.

R.  Defendant Charles Fasano was and/or is employed as the IDOC Medical Coordinator in 2010 with the State of Illinois, at 1301 Concordia Court, P.O. Box 19277, Springfield, IL 62794 and is sued in his individual and official capacities for deliberated indifference to plaintiffs' serious medical needs, harm anf injuries.

S.  Defendant Dr. Magid Fahim was and/or is employed as with Wexford Health Sources, Inc., located at 425 Holiday Drive, Foster Plaza Two, Pittsburgh, PA 15220 and employed as a Contractor/Vendor with the IDOC as the MCC Medical Director, and is sued in his individual and official capacities for the deliberated indifference to plaintiffs' serious medical needs, harm and injuries.

T. Defendant James Krieg was and/or is employed as a Doctor with Wexford Health Sources, Inc., 425 Holiday Drive, Foster Plaza Two, Pittsburgh, PA 15220, or the IDOC located at 1301 Concordia Court, P.O. Box 19277, Springfield, IL 62794, at the MCC, locate at 711 Kaskaskia Street, P.O. Box 711, Menard IL 62259, and is sued in his individual and official capacities for deliberate indifference to plaintiffs' serious medical needs, harm and injuries.

U. Defendant Sam Nwaobasi was and/or is employed as a Doctor with Wexford Health Sources, Inc., 425 Holiday Drive, Foster Plaza Two, Pittsburgh, PA 15220 or the IDOC, located at 1301 Concordia Court, P.O. Box 19277, Springfield , IL at the MCC, Menard, IL 62259, and is sued in his individual and official capacities for deliberate indifference to plaintiffs' serious medical needs, harm and injuries.

V. Defendant Nikki Malley was employed as the Health Care Administrator at MCC with the IDOC, State of Illinois 711 Kaskaskia Street, P.O. Box 711, Menard, IL 62259 and is sued in her individual and official capacities for deliberate in-difference to plaintiffs' serious medical needs, harm and injuries.

W. Defedant R. Pollin (First Name Unknown) was employed as an Assistant Physical for Wexford Health Sources, Inc., 425 Holiday Drive, Foster Plaza Two, Pittsburgh, PA 15220 or the IDOC located at 1301 Concordia Court, P.O. Box 19277, Springfield, IL 62794 at the MCC, at 711 Kaskaskia Street, P.O. Box 711, Menard IL 62259, and is sued in her individual and official capacities.

X. Defendant J. Kennedy (First Name Unknown) was employed as a CMT/Nurse for the IDOC at MCC, located at 711 Kaskaskia Street P.O. Box 711, Menard, IL 62259, and is sued in his individual and official capacities for deliberate indifference to plaintiffs' serious medical needs, harm and injuries.

Y. Defendant M. Nelson (First Name Unknown) was employed as a CMT/Nurse for the IDOC at MCC, locate at 711 Kaskaskia Street P.O. Box 711, Menard, IL 62259, and is sued in his individual and official capacities for deliberate indifference to plaintiffs' serious medical needs, harm and injuries.

Z. Defendant Kenner or Kiner (First Name Unknown) was employed as a CMT/Nusre for the IDOC st MCC, locate at 711 Kaskaskia Street, P.O. Box 711, Menard, IL 62259, and is sued in her individual and official capacities for deliberate indifference to plaintiffs' serious medical needs, harm and injuries.

II.   **PREVIOUS LAWSUITS**

A.   Have you begun any other lawsuits in state or federal court relating to your imprisonment?                                                    ☒ Yes   ☐ No

B.   If your answer to "A" is YES, describe each lawsuit in the space below. If there is more than one lawsuit, you must describe the additional lawsuits on another sheet of paper using the same outline. <u>Failure to comply with this provision may result in summary denial of your complaint.</u>

1.   Parties to previous lawsuits:
Plaintiff(s): Dwayne M. Woodson
Woodson v. Luers, et al., sued for retaliation obstruction of the grievance process?? Not certain at this moment due to brain damages from stroke, can't remember.
Defendant(s):
Patrica Luers, Anthony Rawos, Junge and Tyone Murray

2.   Court (if federal court, name of the district; if state court, name of the county):   USDC-SDIL

3.   Docket number:  07-434-DRH

4.   Name of Judge to whom case was assigned:  Judge Hendron

5.   Type of case (for example: Was it a habeas corpus or civil rights action?):  Civil Rights Action §1983

6.   Disposition of case (for example: Was the case dismissed? Was it appealed? Is it still pending?): Motion for summary judgment was granted.

7.   Approximate date of filing lawsuit:  June 15, 2007

8.   Approximate date of disposition: April 2010 ???

II. PREVIOUS LAWSUITS (CON'T)

Woodson v. Grubman, et al., Case No. 04-100-GPM
Filed this action for retaliation, deliberated indifference to serious medical
needs and dental needs; indifference to the informed consent doctrine. Not
certain at this moment due to brain damage from the stroke. Memory lost at times.

1.   Plaintiff(s): Dwayne M. Woodson

     Defendant(s): Pam Grubman, Eugene McAdory, Adrain Feinnerman, Reetika
                   Kumar, Stephen Doughty, Dr. Platt, Dr. Newbold, Jennifer
                   Middendorf, Deb Koronado, Dawn Grathler, Dietary Manager,
                   Jonathan Walls and Marvis Gross.

2.   USDC-SDIL

3.   04-100-GPM

4.   Chief Judge G. Patrick Murphy

5.   Civil Rights Action §1983

6.   Settlement reached with several defendants' and plaintiff motion to dismiss
     the case granted?

7.   February 13, 2004

8.   August 2007?

II. PREVIOUS LAWSUITS (CON'T)

Woodson v. Office of Chief Legal Counsel, et al., Case No. 02-1076 sued for re-
taliation, conspiracy?

1.   Plaintiff(s): Dwayne M. Woodson

     Defendant(s): IDOC Office of Chief Legal Counsel, Susan O'Leary, Shelton Frye,
                   James Weichmann, Mark Spemcer, Paula Rich, Annette Vanhooser,
                   Les Amdor, Allen Saddoris, Francis Melvin, Captain Knight, Lt.
                   Dalbach, C/O Gerberdine, Sgt. West, C/O Delong, Sgt. Fizzell,
                   Lt. Williams, Betsy Snyder, Mary West-Mayo.

2.   USDC-CDIL

3.   02-1076

4.   Judge Harold Baker

5.   Civil Rights Action :1983

6.   Motion for summaru judgment granted

7.   January 2002

8.   April 2005?                         -3A-

III.   **GRIEVANCE PROCEDURE**

A.   Is there a prisoner grievance procedure in the institution? ⊠ Yes   ⊐ No

B.   Did you present the facts relating to your complaint in the prisoner grievance procedure? Yes to the best of my ability⊠ Yes   ⊐ No and based on what I knew and could remember, etc.

C.   If your answer is YES,
1.   What steps did you take? Filed three grievances seeking relief from the denial of adequate medical care and the stroke I suffered and conditions of confinement that caused the stroke. (See, Exhibit No. 2 thru 2M.

2.   What was the result? Received no response from two of the grievances dated 12-16-10 (Amended/Addendum) and 4-19-10. Initial grievance of 12-16-10 was denied by the Grievance Officer and Warden Redour (Defendant).

D.   If your answer is NO, explain why not.   N/A

E.   If there is no prisoner grievance procedure in the institution, did you complain to prison authorities?   N/A   ⊐ Yes   ⊐ No

F.   If your answer is YES,   N/A
1.   What steps did you take?

2.   What was the result?   N/A

G.   If your answer is NO, explain why not.   N/A

H.   Attach copies of your request for an administrative remedy and any response you received. If you cannot do so, explain why not: Copies of all three grievance filed in this mattter are attached hereto. And the response from the Illinois Administrative Review Board are attached as well. (See, Exhibit No. 2 thru 2M.

IV.   **STATEMENT OF CLAIM**

A.   State here, as briefly as possible, when, where, how, and by whom you feel your constitutional rights were violated.  Do not include legal arguments of citations.  If you wish to present legal arguments or citations, file a separate memorandum of law.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  If your claims relate to prison disciplinary proceedings, attach copies of the disciplinary charges and any disciplinary hearing summary as exhibits. You should also attach any relevant, supporting documentation.

1.  On October 21, 2010 plaintiff, Dwayne M. Woodson ("Woodson") while in his cell, located in the North-One Cellhouse suddenly became confused and disorient, his arm and leg on the right-side of his body started trembling and shaking uncontrollably and his vision became impaired. Woodson was flown by helicopter to the St. Louis University Hospital, in St. Louis, Missouri. He received a CT-Brain Scan, where it was determined he suffered a hemorrhagic stroke, the most fatal type of stroke. A blood vessel inside the top left-hand side of his brain had rupture/burst, causing bleeding in the brain, injury and damage to his brain. (See, Exhibit No. 1, Copy of CT-Brain Scan, attacked hereto).

2.  Plaintiff Woodson alleges that the stroke he suffered as described above, and resulting injuries and damages to his brain was caused by inhumane conditions of confinement, possible retalia-tion, and deliberated indifference to serious medical needs, and an ongoing policy, practice and customs of deliberate indifference to serious medical needs where several defendants failed to ensure that plaintiffs'would receive his baseline evaluations, laboratory testing, treatment plans and medication needed to treat his chronic illness (hypertension), high blood pressure ("HBP"), which all are more fully described below

3.  At all relevant times, unless specified otherwise, de-fendants' acts and omissions occurred pursuant to unlawful, un-constitutional policies, practices and customs, and the maintaining of unlawful inhumane conditions of confinement.

4.  At all relevant times, Defendants' were acting under colors of State Law, pursuant to their authority as officials, agents, contractors or employees of the State of Illinois; within the scope of their employment and office, as representatives of both, private and public entities; and as representatives of a department, agency, office, elected office, agency corporation, special purpose district, or other instrumentality of a state.

5.  On January 30, 2010 a series of frequent, excessive and lenghty "LOCKDOWNS" begin to occur at the Menard Correctional Center("MCC"). Through December 16, 2010 these occurrences in combination with the inhumane conditions of confinement, i.e., the overcrowded prison population at MCC, lack-of-out-of-cell time, denial of medications needed to treat serious medical care and treatment; and denial of treatment needed to reduce elevated levels of blood pressure("BP"), caused plaintiffs' chronic illness (Hypertension) to worsen, and exacerbated his serious medical condition to a deteriorating level, thus causing him to suffer a hemorraghic stroke.

6.  On January 31, 2010 Woodson was placed on "Lockdown" due to a violatile incident in the West Cellhouse, until February 21, 2010. Total 22 days.

7.  On or about February 4, 2010 Woodson believes he received a pass to see Dr. Krieg, and believes the pass was cancelled due to overcrowding, back log due to previous lockdowns.

8.  On March 4, 2010 Woodson received a call line pass to see Dr. Krieg as part of his hypertension/cardiovascular clinic because the medications for his chronic illness were scheduled to expire on April 1st. and 3rd, 2010 (prescriptions cycle ends). and had to submit to another series of baseline evaluations, laboratory tests, and treatment plans. This pass was also cancelled. In addition, the passes received to see Dr. Krieg on March 30th; April 6th, and a pass to see Physician Assistant R. Pollin on April 13th of 2010 were all cancelled.

9.  On March 7, 2010 Woodson was placed on "Lockdown" due to a violatile incident in the North-One Cell House, until April 19, 2010. Total of 44 days.

10.  On March 30, 2010 based on information and belief the North-One Cell House Major, Correctional Major Inman cancelled the pass in retaliation for the above mentioned March 7th assaults on several staff by other prisoners. Woodson had no involvement in that incident, and was on a visit when thoses attacks occurred. Woodson posed no acute threat to any staff, and based on information, the prisoners allegealy responsible for the assaults were placed in segregation on March 7, 2010, some 23 days earlier. There was no need to prevent or deny Woodson of the examinations necessary to continue treatment necessary for his chronic illness, high blood pressure ("HBP").

11.  On April 1st and 3rd, 2010 Woodson prescriptions for Metoprolol Tartrate 100mg (Lopressor); Hydrochlorothiazide 25mg (Hydrodiuril); Ecotrin 81mg (Aspirin); and Enalapril Malgate 20mg (Uasotec) to treat his HBP expired. Woodson was without his Enalapril Maleate (Uasotec) for 51-days, and the other HBP medications mentioned, for 20-days.

12.  Plaintiff alleges that the denial of medical examinations necessary to receive medications for the treatment of his HBP for 20-days and 51-days deprived him of adequate ongoing medical care, and plaintiff was at a substantial risk of serious harm and defendants Dr. Krieg and Major Inman disregarded the risk to his health.

13.  At all relevant times Defendants' Randle, Taylor, Geatz, Redour, Harrington, Stocks, Major Inman, John or Jane Doe's (Lockdown Coordinators) Wexford Health sources, Inc., Halloran, Conn, McCain, Dr. Funk, Dr. Shicker, Fasano, Dr. Fahim, Dr. Krieg, Dr. Nwaobasi, Malley, R. Pollin, Kennedy, Nelson and Kenner or Kiner were either responsible for the maintaining of adequate procedures, safeguards and policies; ensure ongoing baseline evaluations, laboratory teats, treatment plans and medications; and enforcing the procedures under IDOC Lockdown A.D. 04.03.105 policies, MCC Lockdown I.D. 04.03.105; and both IDOC Chronic Illnesses A.D. 05.01. 301 policies, MCC Chronic Illnesses I.D. 05.01.301 policies, which requires the IDOC, staff, Lockdown Coordinators, IDOC agency Medical Director, Health Care Unit Administrator, Wardens and Contractors to continue to provide medical examinations and treatment to plaintiff, even while the facility ison lockdown status.

14.  Defendants' Acts and ommissions will be more fully described below to the best of plaintiffs' ability. Plaintiff has provlems with his ablty to remain focus, concentrate, and frequent episodes of memory lost, among other issues.

15.  On April 8, 2010 Woodson told Defendant CMT/Nurse J Kennedy that he needed his HBP medications, and call line passes were being cancelled. Kennedy stated "...Passes will be rescheduled due to the Lockdow."

16.  On April 9, 2010 Woodson told Defendant CMT/Nurse Nelson that he needed his HBP medications and call line passes were being cancelled. Defendant Nelson stated "...You are on Lockdown and passes will be rescheduled." Woodson told Nelson he has experienced painful headaches, tingling and numbness in his arms, hands and has been unable to take deep breaths. Nelson stated "we'll get you over soon."

5—2

17. ON APRIL 14, 2010 WOODSON RECEIVED AN IN CELLHOUSE PASS FROM THE HEALTH CARE UNIT ("HCU"), TO HAVE BLOOD TAKEN. WOODSON TOLD CMT/NURSE LISA GALES THAT HE NEEDED HBP MEDICATION, AND CALL LINE PASSES WERE BEING CANCELLED. GALES MADE A NOTE ON A LIST CONTAINING WOODSON'S NAME AND OTHER NAMES AFTER TAKING HIS BLOOD, AND SHE STATED "... THEY SHOULD HAVE BEEN ORDERED ANYWAY BECAUSE OF THE LOCKDOWNS".

18. ON APRIL 19, 2010 WOODSON FILED A GRIEVANCE ALLEGING IN TER ALIA HE WAS BEING SUBJECTED TO THE DENIAL OF HBP MEDICATIONS, EXAMINATIONS AND TREATMENT DURING DEADLOCK/LOCKDOWN STATUS OF THE FACILITY. PLAINTIFF NEVER RECEIVED A RESPONSE. (SEE, EXHIBIT No. 2, 2A + 2B, ATTACHED HERETO)

19. ON APRIL 20, 2010 WOODSON RECEIVED A CALL LINE PASS TO SEE DR. KRIEG. BLOOD PRESSURE ("BP") READING AT 160/90. WOODSON TOLD KRIEG THAT HE HAVEN'T BEEN RECEIVING ALL OF THE HBP MEDICATION SINCE ABOUT THE BEGINNING OF THE MONTH. KRIEG STATED CALL PASSES FOR "MEDICAL EVALUATION" ARE BEING

5-3

RESCHEDULED WHILE ON "LOCKDOWN." DR. KRIEG
STATED "YOUR MED'S ARE BEING ORDERED, AND
WILL BE A FEW DAYS." WOODSON TOLD KRIEG HE
HAS FILED A GRIEVANCE. KRIEG STATED "IT'S
MOOT NOW." "IT DOESN'T MATTER NOW BECAUSE
YOUR MED'S ARE BEING ORDERED NOW."

20.   ON APRIL 22, 2010 WOODSON ONLY
RECEIVED HIS METOPROLOL TARTRATE 100 MG
(LOPRESSOR); HYDROCHOROTHIAZIDE 25 MG
(HYDRODIURIL); AND ECOTRIN 81MG (ASPIRIN).
WOODSON DID NOT RECEIVE HIS ENALAPRIL
MALEATE 20 MG (VASOTEC) UNTIL MAY 24,
2010. ALTHOUGH DR KRIEG SAID THE ENALAPRIL
MALEATE WAS BEING ORDERED ON APRIL 20, 2010,
IT TOOK 34-DAY MORE DAY TO RECEIVE IT,
A TOTAL OF 74-DAYS FROM APRIL 1st, 2010
WHEN WOODSON RUN OUT OF HIS ENALAPRIL
MALEATE 20 MG (VASOTEC).

21. ON MAY 27, 2010 WOODSON WAS SEEN
BY DEFENDANT DR. KRIEG. BP READING WAS 170/100
AND SUGAR AT 98. PLAINTIFF KRIEG HE DID NOT
RECEIVE THE VASOTEC GENERIC — ENALAPRIL MALEATE
UNTIL MAY 24, 2010. KRIEG STATED HE SAW
THE FIRST GRIEVANCE, AND ADDED "... I KNOW

5-4

I'LL BE READING ABOUT THE DECAY IN RECEIVING YOUR ENALAPRIL MALEATE.

22. ON JUNE 10, 2010 WOODSON RECEIVED A CALL LINE PASS TO SEE DR. SAM NWAOBASI. BP READING WAS 140/80. DEFENDANT NWAOBASI STATED "... THIS ABOUT YOU NOT RECEIVING MEDICATIONS".

23. ON JUNE 11, 2010 MCC WAS PLACED ON "LOCKDOWN" TO AN INCIDENT IN THE SOUTH LOWER CELLHOUSE UNTIL JULY 7, 2010.  TOTAL OF 26-DAYS.

24. ON JULY 16, 2010 WOODSON WAS SEEN BY MCC MEDICAL DIRECTOR, DR. FAHIM. BP READING WAS 130/80.  FAHIM STATED " IN AN EFFORT TO GET YOUR BP UNDER CONTROL YOUR ENALAPRIL MALEATE (GENERIC FOR VASOTEC) IS BEING INCREASE TO 40 MG DAILY".

25. ON JULY 22, 2010 WOODSON WAS EXPOSED TO EXCESSIVE HEAT. ICE WAS GIVEN ONLY IN THE EVENING AT ABOUT 5:00 P.M.  THERE'S NO COLD WATER IN THE CELL, AND THE CELLS IN NORTH-ONE CELLHOUSE ARE SMALL WHEN ONLY ABOUT 13.5 SQUARE FEET OF CELL          FLOOR SPACE, NO VENTILATION.

THE HEAT INDEX AVERAGED 110° ON THE 23 AND 24. THE CELLS FELT LIKE AN OVEN.

26. ON JULY 27, 2010 MCC WAS PLACED ON "LOCKDOWN" UNTIL JULY 28, 2010. TOTAL OF 1-DAY.

27. ON JULY 28, 2010 THE HEAT INDEX REACHED BETWEEN 106° AND 121° IN THE CELLS.

28. ON JULY 29, 2010 WOODSON RECEIVED A BLOOD PRESSURE CHECK, WHICH READ AT 160/90 BY A JOHN OR JANE DOE CMT/NURSE.

29. ON AUGUST 2, 3, 4; AUGUST 9 THRU THE 15; AND AUGUST 19, 2010 THE AVERAGE HEAT INDEX IN THE CELLS REACHED BETWEEN 115° AND 135°. PLAINTIFF COULD NOT THINK STRAIGHT, AND FELT LETHARGY, AND DEJECTED. HIS HEAD WAS HURTING, AND FELT LIKE IT WAS SWELLING. THE CELL FELT LIKE A OVEN, AND THE COLD WATER IN THE CELL DOES NOT GET COLD.

30. ON AUGUST 22, 2010 WOODSON WAS SUBJECTED TO ANOTHER "LOCKDOWN". THIS TIME MCC WAS PLACED ON LOCKDOWN FOR 51-DAYS. TOTAL OF 51-DAYS UNTIL OCTOBER 13, 2010.

31. ALTHOUGH WOODSON CAME OFF LOCKDOWN ON OCTOBER 13, 2010, MCC WAS PLACED BACK ON "LOCKDOWN" A FEW HOUR LATER, AND WILL BE MORE FULLY ALLEGED BELOW, AT PARAGRAPH(S) _____ .

32. ON SEPTEMBER 3, 2010 WOODSON RECEIVED A BP CHECK THAT READ "180/100" BY CMT/NURSE KENNER OR KINER, AN AFRICAN AMERICAN FEMALE, (FIRST NAME UNKNOWN).

33. ON SEPTEMBER 5, 2010 WOODSON RECEIVED A BP CHECK THAT READ "180/100" BY CMT/NURSE KENNER OR KINER.

34. ON SEPTEMBER 6, 2010 DEFENDANT CMT/NURSE KENNER OR KINER CAME TO PLAINTIFFS CELL IN THE NORTH-ONE CELLHOUSE AT APPROXIMATELY 8:30 AND STATED "... I NEED YOUR NAME AND NUMBER AGAIN". THIS DID NOT MAKE SENSE BECAUSE IF SHE KNEW THE CELL NUMBER, SHE COULD CHECK THE OFFENDER TRACKING SYSTEM (OTS) OF IDOC.

35. ON SEPTEMBER 10, 2010 WOODSON WAS GIVEN A BP CHECK (IN HIS CELL) READ AT 164/96 BY CMT/NURSE TILLERMAN.

5-7

36. ON SEPTEMBER 24, 2010 WOODSON RECEIVED A BLOOD PRESSURE CHECK (IN HIS CELL) THAT READ 130/98· BY CMT/NURSE KEINER OR KINER. SHE STATED "... IT'S BEEN A MONTH ALMOST AND YOU HAVEN'T BEEN BY A DOCTOR YET. PLAINTIFF STATED "... I DON'T KNOW WHAT'S GOING ON." "THEY NEED TO PROVIDE SEPARATE HOUSING FOR PRISONERS 45-YEARS OF AGE OR OLDER WITH CHRONIC ILLNESS, AND DAILY INDOOR AND OUT-DOOR EXERCISE, GERIATRIC PROGRAMS AND ELDER-STATEMENT PROGRAM NEED TO BE REINSTATED, "ETC.

37. ON SEPTEMBER 30, 2010 WOODSON RECEIVED A (IN CELLHOUSE HCU STATION) EXAMINA-TION BY DR. NWAOBASI. BP CHECK READ AT 185/112. DR. NWAOBASI ASKED PLAINTIFF IF HE WAS TAKING THE MEDINE MEDICINE AND WOODSON STATED "... YEAH, WHEN I HAVE THEM" "BUT I NEED AN EXERCISE PERMIT SO I CAN GO TO THE GYM OR YARD TO EXERCISE EVERYDAY BECAUSE THE CELLS ARE TOO SMALL. AND I NEED AN EXTRA ICE PERMIT FOR ICE EVERY 3-HOURS WHEN IT'S EXTREMELY HOT." CMT/NURSE RON (LAST NAME UNKNOWN) STATED. "YOU'RE NOT GETTING SPECIAL TREATMENT. PLAINTIFF THEN STATED "IT'S NECESSARY AND ADEQUATE PREVENTIVE

MEDICAL CARE." CMT/NURSE RON THEN STATED, "WELL WHAT'S ADEQUATE FOR YOU NOW IS A 23-HOURS OBSERVATION." WOODSON TOLD HIM HE'S NOT THE DOCTOR. DR. NWAOBASI STATED, "MENARD, IDOC AND WEXFORD WON'T ALLOW US TO ISSUE EXERCISE PERMITS," "NOR ANY ICE PERMITS." "WOODSON ASKED NWAOBASI ABOUT A LARGE CELL PERMIT, AND NWAOBASI STATED, "YOU CAN'T GET THAT NEITHER."

38. ON SEPTEMBER 30, 2010 WOODSON WAS ADMITTED TO THE HCU FOR 23-HOURS OBSERVATION AND RECEIVED MEDICATIONS ALMOST EVERY TWO OR THREE HOURS TO BRING DOWN HIS BP, AND WAS RELEASED THE NEXT DAY.

39. ON OCTOBER 13, 2010 AFTER BEING ON A 51-DAYS "LOCKDOWN", MCC WENT BACK ON LOCKDOWN SEVERAL HOURS LATER, FOR 34-DAYS, UNTIL NOVEMBER 15, 2010. PLAINTIFF DID NOT LEAVE THE CELL BECAUSE HE WAS CLEANING IT AFTER SUCH A 51-DAY LOCKDOWN.

40. PLAINTIFF ALLEGES THIS AMOUNT TO A 85-DAY LOCKDOWN WHERE HE POSED NO ACUTE THREAT OR SECURITY RISK, CONSTITUTES AN DELIBERATE INDIFFERENCE TO WOODSON'S SERIOUS MEDICAL

IN THE
UNITED STATES DISTRICT COURT
FOR THE~~FOR THE~~ SOUTHERN DISTRICT OF ILLINOIS

SCANNED AT MENARD and E-mailed
5|6|13 by TK 51 pages
date          initials   No.

DWAYNE M. WOODSON, N10392 )
Plaintiff, )
  v. )  Case No. 13-CV-240-GPM
PAT QUINN, et al., )
  ) The Honorable
  ) G. Patrick Murphy
Defendant ) U.S. District Judge.

## PROOF/AFFIDAVIT OF SERVICE

TO: Clerk, of the            TO: _____
    U.S. District Court
    ~~Southern District of~~ Illinois
    750 Missouri Ave.
    East St. Louis, IL 62201

TO: _____        TO: _____

PLEASE TAKE NOTICE that on May 6, 2013 , 20___, I have placed the
documents listed below in the institutional mail at Menard Correctional Center,
properly addressed to the parties listed above for mailing through the United States Postal
Service: by placing the attached Amended Complaint in the hands
of law library staff for E-Filing to ~~the above captioned~~
~~case. Woodson v. Quinn, et al., Case No. 13-CV-240-GPM~~

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare, under penalty of
perjury, that I am a named party in the above action, that I have read the above
documents, and that the information contained therein is true and correct, to the best of my
knowledge.

DATE: May 6, 2013              /s/ _____
                               NAME: Dwayne M. Woodson
                               IDOC#: Reg. No. N10392
                               Menard Correctional Center
                               P.O. BOX 1000
                               Menard , IL 62259-1000

Jul 26 2012  0:07 PM

NEED TO EXERCISE, COMBINED WITH THE ALL OF THE INHUMANE CONDITIONS OF CONFINEMENT.

41. ON OR ABOUT OCTOBER 19, AND ABOUT 15-DAYS EARLIER WOODSON'S MEDICATIONS RAN OUT. IT'S BELIEVED THAT THE ENALAPRIL MALEATE 40MG (VASOTEC) RAN OUT ON OCTOBER 4TH, 2010. HERE, PLAINTIFF HAD ALREADY BEEN WITHOUT HIS ENALAPRIL MALEATE (VASOTEC) FOR 54-DAYS, AND NOW HE WAS WITHOUT IT FOR 15-MORE DAYS, A TOTAL OF 69-DAYS. TWO MORE DAYS LATER WITHOUT IT, HE WAS ABOUT TO PAY AN ALSO DEADLY PRICE.

42. ON OCTOBER 21, 2010 WOODSON TOLD DEFENDANTS' REDOUR, HARRINGTON AND STOCKS WHILE THEY WERE MAKING THEIR TOUR OF THE NORTH-ONE CELLHOUSE THAT HE HAD NOT RECEIVED HIS ENALAPRIL MALEATE (VASOTEC) FOR 17-DAYS, AND RAN OUT OF THE REST OF HIS MEDICINE A FEW DAYS AGO. REDOUR SAID TO SEND A KITE, AND HE'LL CHECK INTO IT. WOODSON TOLD REDOUR THAT HE CAN SUFFER A HEART ATTACK, STROKE OR DEATH WITHOUT HIS MEDICATIONS BECAUSE HE CAN'T GET ANY ADEQUATE EXERCISE, AND NEED EXERCISE. WOODSON ALSO TOLD DEFENDANT STOCK AND HARRINGTON

5-10

THAT THE OLDER PRISONERS NEED DAILY EXERCISE AND INDOOR AND OUTDOOR ACTIVITIES, AND IT'S NOT ENOUGH AIR AND ROOM IN THE CELLS, AND THERE ARE TO MANY LOCKDOWNS. REDOUR STATED THE FACILITY IS "TO OVERCROWDED TO GIVE YARD OR GYM EVERYDAY." AND REDOUR SAID SOME OTHER THINGS ABOUT THE LOCKDOWNS, BUT CAN'T REMEMBER.

43.  ON OCTOBER 21, 2010 A FEW HOURS MAYBE, AFTER TALKING WITH ALL THREE OF THE MENTIONED WARDENS, WOODSON SUDDENLY BECAME CONFUSED AND DISORIENT. HIS ARM AND LEG ON THE RIGHT SIDE OF HIS BODY STARTED TREMBLING AND SHAKING UNCONTROLLABLY, AND HIS VISION BECAME IMPAIRED.

44.  WITH THE HELP OF HIS CELLIE "LUCAS" WOODSON SOUGHT MEDICAL ATTENTION. SERGEANT BRADLEY AND CORRECTIONAL OFFICE STEWART RESPONDED IMMEDIATELY, AND PROMPTLY ALERTED MEDICAL STAFF.

45.  SUBSEQUENTLY, WOODSON WAS IMMEDIATELY WHEELCHAIRED TO THE HCU EMERGENCY ROOM, PRE-SUMABLY DEFENDANTS' MALLEY AND DR. FAHIM KNEW WOODSON WAS HAVING A STROKE. HE TRANSPORTED BY

5-11

AMBULANCE TO A NEARBY HELICOPTER PORT OR PICK
UP POINT, WHERE HE WAS THEN TAKEN BY
HELICOPTER TO THE ST. LOUIS UNIVERSITY HOSPITAL, IN
ST. LOUIS, MISSOURI. HE RECEIVED A CT-BRAIN SCAN,
WHERE IT WAS DETERMINED HE SUFFERED A HEMORRHAGIC
STROKE. THE MOST FATAL TYPE OF STROKE. A BLOOD
VESSEL IN THE TOP LEFT-HAND-SIDE OF HIS BRAIN
HAD RUPTURE/BURST, CAUSING BLEEDING IN THE BRAIN,
INJURIES AND DAMAGE. (SEE, EXHIBIT No.-1, COPY
OF CT-BRAIN SCAN ATTACHED HERETO)

46.   WHILE AT THE HOSPITAL WOODSON LEARNED HE
WAS LUCKY, VERY LUCKY THAT THE STROKE OCCURRED WHILE
HE WAS AWAKE, AND NOT SLEEPING. WOODSON STRUGGLE TO
SPEAK, AND IT FELT HIS RIGHT SHOULDER WAS ATTACHED TO
HIS RIGHT, OR LIKE HIS RIGHT HAND WAS ACTUALLY
ATTACHED TO HIS RIGHT SHOULDER. HIS TWO FINGERS
TO HIS RIGHT-HAND WAS HARD TO MOVE, AS WELL AS
HIS FOUR SMALL TOES TO HIS RIGHT FOOT. HE LEARNED
IT WAS A BLOOD VESSEL INSIDE HIS BRAIN ABOUT THE SIZE
OF A PIECE OF THREAD OR HAIR THAT BURSTED. THE
DOCTOR STATED THE BRAIN CAN REWRITE ITSELF IF IT
HAS BEEN VERY ACTIVE, BUT THERE'S WAS A 35% CHANCE
NOW, THAT WOODSON CAN SUFFER ANOTHER STROKE. PLAINTIFF
WAS TOLD HE HAD TO EXERCISE, TAKE THE MEDICATIONS TO
KEEP HIS BP UNDER CONTROL. PLAINTIFF WAS IN AN IN-

5-12

TENSIVE CARE UNIT.

47. ON OCTOBER 23, 2010 WOODSON WAS RETURNED TO MCC/HCU AT APPROXIMATELY 10 P.M. MCC WAS STILL ON LOCKDOWN AND REMAINED ON LOCKDOWN UNTIL NOVEMBER 15, 2010.

48. ON OCTOBER 24, 2010 WOODSON WAS RETURNED TO HIS CELL IN THE NORTH-ONE CELLHOUSE, AND HAD NOT RECEIVED ANY MEDICATIONS FOR HIS BP OR DAMAGE BRAIN. WOODSON REMEMBERED WHAT THE DOCTOR SAID ABOUT THE 35% CHANCE HE COULD HAVE A SECOND STROKE, AND WAS IN FEAR HE WAS GOING TO DIE. WOODSON REQUESTED SOME GRIEVANCE FORMS AND WAS TOLD BY THE GALLERY OFFICER THERE WERE NOT ANY.

49. ON OR ABOUT OCTOBER 25, 2010 WOODSON GAVE A LETTER/REQUEST TO A CMT/NURSE MAKING MEDICINE DELIVERIES ON THE GALLERY REQUESTING HIS MEDICATION. HE WAS GIVEN MEDICATION BY STAFF LATER, AND ON THE 26 OR 27 HE FINALLY RECEIVED HIS PACKETS OF MEDICATIONS. HE RECEIVED NOTHING FOR HIS BRAIN DAMAGE CAUSED BY THE STRIKE

5-13

50.   ON NOVEMBER 3, 2010 WOODSON WAS SEEN BY DR. NWAOBASI AND CMT/NURSE TILLERMAN. BP READ AT 150/90. WOODSON TOLD DEFENDANT NWAOBASI THAT SOMETHING WRONG "WITH MY HEAD". NWAOBASI STATED "YOU HAVE BRAIN DAMAGE BECAUSE OF THE STROKE YOU SUFFERED", AND "THERE'S NOTHING I CAN GIVE YOU FOR THAT". ON THE WAY BACK TO HIS CELL, WOODSON ASKED THE SERGEANT CAGE FOR SOME GRIEVANCE FORMS, THEY WERE OUT.

51.   ON NOVEMBER 15, 2010 THE LOCKDOWN IMPOSED ON OCTOBER 13, 2010 AFTER COMING OFF A 51-DAY LOCKDOWN WAS LIFTED, AFTER 34-DAYS. ESSENTIALLY, PLAINTIFF HAD BEEN SUBJECTED TO A 85-DAYS LOCKDOWN.

52.   ON NOVEMBER 18, 2010 WHILE ENROUTE TO THE LAW LIBRARY WOODSON REQUESTED GRIEVANCE FORMS AT THE CELLHOUSE SERGEANT CAGE, NONE WERE AVAILABLE.

53.   ON DECEMBER 2, 2010 THE MCC WAS PLACED ON "LOCKDOWNS" DUE TO BAD WEATHER. TOTAL 1-DAY.

54.   ON DECEMBER 3, 2010 WOODSON REQUESTED SOME GRIEVANCE FORMS AT THE SERGEANT CAGE. NONE WERE AVAILABLE.

5-14

57. On Decemebr 14, 2010 while at the law library Woodson learned that it takes weeks to get the full benefits of blood pressure medications. This meant that the 20-day delay was equivalent to 34-days; and the 54-day delays is equivalent to 68-days, etc. On this date Woodson was able to get grievances.

58. On December 16, 2010 Woodson placed his grievance in the prison internal mailing system (his cell bars) for filing; and his amended grievance using the same mailing system.

59. On January 10, 2011 Woodson received call pass to the MCC/HCU to see defendant Fahim. BP read 133/88. Woodson asked for a exercise permit and told Fahim that he was having mental and physical issues that he believe are mental and physical complications from the stroke. Also told Fahim that he needed some rehabilitation therapy, and there is medications for brain damages caused by strokes, and asked if a neurologist could take a look at his brain, and Fahim stated, "You're be okay" "Just be lucky you didn't die" "You could have died". (See, Exhibit No. 4, 4A and 4B, Copy of information on NeuroAid stroke medication, attached hereto).

60. On January 14, 15, 2011 Woodson was placed on "lockdown". Total of 20days.

61. On January 28, 2011 J. Cowan Grievance Officer denied Plaintiff grievance.

62. On February 18, 2011 Woodson placed his grievance in the internal mailing system (his cell bars) for mailing to the IDOC Administrator Review Board (ARB).

64. On March 10, 2011 the ARB/IDOC his grievance concluding it was not filed on time and was due by March 1, 2011 but was not received until March 3, 2011. (See, Exhibit No. 2L & 2M, attached hereto).

## ALLEGATION OF CLAIMS

65. Defendants' Wexfords', Halloran, Conn, McCain and Fund were indifferent to Plaintiffs serious medical needs and were personally responsible for the failure to have any adequate policies and safeguard procedures in place to ensure ensure ongoing baseline evaluations, laboratory testing. Treatment plans and medication for his chronic illness (hypertension). Will continue pursuant to IDOC Lockdown Policies A.D. 04.03.105, MCC Lockdown Policies I.D. 04.03.105, and IDOC

Chronic Illnesses Policies I.D. 04.03 105, and/or ignored that treatment for serious medical needs were not provided.

66.  Defendants' Redour, Harrington, Stocks and the John or Jane Doe's (Lockdown Coordination) were indifferent to Plaintiff serious medical needs and were responsible for ensuring ongoing badeline evaluations, laboratory testing, treatment plans and medications for his chronic illness (hypertension) will continue pursuant to IDOC Lockdown Policies A.D. 04.03.105, MCC Lockdown Policies A.D. 05.01.301, MCC chronic illnesses I.D.05.01.301 Policies and/or ignored that treatment for serious medical needs were not provided.

67.  Defendants; Dr. Louis Shicker as the IDOC agency medical director and Fasano was indifferent to plaintiffs' serious medical needs and also personally responsible for the failure to have adequate policies and safeguards procedures in place to ensure ongoing baseline evaluations, laboratory testing, treatment plans and medication for his chronic illness(Hypertension) will continue pursuant to idoc Lockdown A.D.04.03.105 Policies, MCC Lockdown I.D.04.03.105 Policies, and IDOC chronic A.D. 05.01.301 Policies MCC chronic Illnesses I.D.05.01.301 policies, and/or ignored treatment for serious medical needs were not provided, not provided.

68.  Defedants' Dr. Magid Fahim as the MCC on site medical Director and Nikki Malley as the MCC on site Health Care Administrator, were indifferent to Plaintiffs serious medical needs and also personally responsible for failing to enforce MCC and IDOC Regulations, Policies and procedures to ensure ongoing baseline evaluations, laboratory testings, treatment plans and medication for his chronic illnesses (hypertension) continue pursuant to IDOC Lockdown A.D.04.03.105Policies, MCC Lockdown I.D. 04.03.105 Policies, and IDOC chronic illnesses A.D. 05.01.301 Policies, MCC chronic illnesses I.D.05.01.301, Policies, and/or ignored treatment for his serious medical needs were not provide.

PLAINTIFF ALSO ALLEGES AS AN INDEPENDENT
CLAIM THAT DEFENDANT MAJOR INMAN WAS
DELIBERATELY INDIFFERENT TO HIS SERIOUS MEDICAL
NEEDS WHEN HE ALLEGEDLY INTERFERRED WITH
THE ACCESS TO ONGOING MEDICAL CARE AND
TREATMENT BY PREVENTING PLAINTIFF AND OTHER
PRISONERS FROM GOING ON MEDICAL PASSES DURING
THE MARCH 7, 2010 LOCKDOWN THROUGH APRIL 19,
2010, IN RETALIATION FOR A STAFF ASSAULTS ON
SEVERAL OFFICER WHO WERE ALLEGEDLY ATTACKED BY
SEVERAL PRISONERS. PLAINTIFF WAS PREMITTED TO GO
ON THE APRIL 14, 2010 PASS TO THE CELLHOUSE PASS TO
SEE CMT/NURSE LISA GILES. PLAINTIFF HAD BEEN
WITHOUT HBP MEDICINE FOR APPROXIMATELY 14-DAYS
(SEE, PARA. AND ON "LOCKDOWN" FOR APPROXIMATELY
40-DAYS. (SEE,

5-17

## V.    REQUEST FOR RELIEF

State exactly what you want this court to do for you.  If you are a state or federal prisoner and seek relief which affects the fact or duration of your imprisonment (for example: illegal detention, restoration of good time, expungement of records, or parole), you must file your claim on a habeas corpus form, pursuant to 28 U.S.C. §§ 2241, 2254, or 2255.  Copies of these forms are available from the clerk's office.

Compensatory damages in the sum of $100.00 dollars against each defendantm jointly and severally for the deliberate indifference to serious medical needs; injuries to his brain; and intentional infliction of pain and suffering; and emotional and mental anguish; (except for defendants Quinn and Godinez).
Punitive damages in the summ of $200.000 dollars against each defendant, jointly and severally; (except for defendant Quinn and Godinez). (See, page 7, attached hereto).

## VI.    JURY DEMAND (check one box below)

The plaintiff ☒ does ☐ does not request a trial by jury. May seek leave of the Court at a later date for a trial by the Court.

## DECLARATION UNDER FEDERAL RULE OF CIVIL PROCEDURE 11

I certify to the best of my knowledge, information, and belief, that this complaint is in full compliance with Rule 11(a) and 11(b) of the Federal Rules of Civil Procedure. The undersigned also recognizes that failure to comply with Rule 11 may result in sanctions.

Signed on: __May 6, 2013__
           (date)

__P.O. Box 1000__
     Street Address

__Menard, IL 62259-1000__
     City, State, Zip

_____
Signature of Plaintiff

__Dwayne M. Woodson__
     Printed Name

__Reg. No. N-10392__
Prisoner Register Number

__Pro-Se Litigant__
Signature of Attorney (if any)

(Rev. 7/2010)                    6

**WHEREFORE,** plaintiff Woodson respectfully request that this court enter judgment granting plaintiff the following:

A.   A declaration against defendant the Honorable Patrick Quinn, that the acts and omissions in maintaining over-crowded prison population at Menard Correctional Center is unconstitutional, and violates plaintiffs right under Constitution and laws of the United States;

B.   Issue an ORDER against defendant Godinez enjoining him from continuing to subject plaintiff to the inhumane coniditions described herein;

C.   Compensatory damages in the amount of $100.000 dollars against defendants' Redour, Harrington, Stocks, Inman, Gaetz, John or Jane Doe's (Lockdown Coordinator), Wexford Health Sources, Inc., Halloran, Conn, McCain, Funk, Shicker, Fasano, Dr. Fahim, Dr. Krieg, Dr. Nwaobasi, Malley, R. Pollin, Kennedy, Nelson and Kenner or Kiner jointly and severally the deliberate indifference to serious medical needs; emotional and mental anguish, harm, injuries and damages to plaintiff brain;

D.   Punitive damages in the amount of $200.000 dollars against each defendant named in the above paragraph C;

E.   Issue an ORDER against defendant Taylor and Randle declaring the conditions at Menard Corr. Ctr. while they were Directors were unconstitutional;

F.   A jury trail on all issues triable by jury;

G.   Plaintiff cost in this suit; and

H.   Any additional relief this court deems just, proper, and equitable.

Dated: May 6, 2013

Respectfully Submitted,

/s/ _____
Dwayne M. Woodson, Pro-Se
Reg. No. N-10392
P.O. Box 1000
Menard, IL 62259-1000

-6A-



Dr. Kaushal

Exhibit No. 1

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

| Date: 4.19.10 | Offender: (Please Print) Woodson, Dwayne M. | ID#: N-10392 |
|---|---|---|

| Present Facility: Menard Corr. Ctr. | Facility where grievance issue occurred: Menard Corr. Ctr. |
|---|---|

**NATURE OF GRIEVANCE:**

- ☐ Personal Property
- ☒ Staff Conduct
- ☐ Transfer Denial by Facility
- ☐ Disciplinary Report: _____
- ☒ Mail Handling
- ☐ Dietary
- ☐ Transfer Denial by Transfer Coordinator
- ☐ Restoration of Good Time
- ☒ Medical Treatment
- ☐ Disability
- ☐ HIPAA
- ☒ Other (specify): Violation of the Privacy Act; Retaliation; and Unconstitutional Policies, Etc.

Date of Report _____ Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:**
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: Grievant, Dwayne M. Woodson, Reg. No. N-10392 submits this greivance

pursuant to Title 20 Adm.Code §504.840; IDOC A.D.04.01.114 Local Offende Grievance Pro-

cedures, @ II.G.2.a(1), with "special circumstances" for emergency review by the Chief

Administrative Officer, seeking relief from the acts and/or omissions by staff here at

Menard Corr. Ctr., with regards to: 1) the failure to provide blood pressure medications

needed to prevent a possible stroke, heart attack and death, in violation of IDOC

A.D.04.03.105 Chronic Illnesses; and 2) an unwarranted invasion of personal privacy of

both, Grivant and Grievant's fiancee (a private citizen), in violation of inter alia,

the State of Illinois laws, statutes and provision; IDOC A.D.03.02.108 Standards of Con-

duct, and Title 20 Adm.Code §120 Rules of Conduct; Institutional Directives and Depart-

(Con't Opposite Page)

Relief Requested: (See, Paragraphs 13 thru 17 for relief being requested at page 3 of 3).

☒ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Offender's Signature     N-10392     04 / 19 / 10
                         ID#          Date

(Continue on reverse side if necessary)

**Counselor's Response (if applicable)**

Date Received: ___/___/___   ☐ Send directly to Grievance Officer   ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

Print Counselor's Name     Counselor's Signature     Date of Response

**EMERGENCY REVIEW**

Date Received: ___/___/___   Is this determined to be of an emergency nature?   ☐ Yes: expedite emergency grievance
☐ No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

Chief Administrative Officer's Signature     Date

Exhibit No. 2

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE** (Continued)

mental Rules, as well as Federal laws under the Civil Rights Act, Privacy Act, and both the Illinois and U.S. Constitutions.

### I. Denial of Hypertension/Blood Pressure Medications, Examinations And Treatment During Deadlock/Lockdown Status of The Facility

1. Grievant has an Chronic Illness as defined by IDOC A.D.04.03.105, and has been denied the following:

   a). Hydrochilorothiazide 25 mg/denied since 4.3.10
   b). Enalapril Maleate 20 mg/denied since 4.3.10
   c). Metoprolol 100 mg/denied since 4.4.10
   d). Apsir-Low 81 mg/denied since 4.3.10

2. Grievant alleges that this constitutes "a substantial risk of imminent" stroke, heart attack, or death. Grievant has experienced painful headaches, tingling and numbness to his arms and hands; and has been unable to take deep breaths.

3. Grievant alleges, based on information and belief, Dr. Krieg, Dr. Fahim, Nikki Malley,  R. Pollion, Asst. Warden Shannis Stock and Wexford Health Services and/or Sources are all responsible. All call passes for 3.4.10, 3.30.10, 4.6.10, 4.13.10 were cancelled and Grievant's medication expired on or about 4.1.10.

4. Grievant told CMT/Nurse J. Kennedy on 4.8.10 that he needed medication, and call line passes were being cancelled. CMT/Nurse Kennedy stated call line passes will be re-scheduled due to the lockdown.

5. Grievant told CMT/Nurse Nelson on 4.9.10 that he needed medications, and call line passes were being cancelled. CMT/Nurse Nelson stated call line passes will be re-scheduled due to the lockdown.

6. Grievant told CMT/Nurse Lisa Gales on 4.14.10 that he needed medications, and call line passes were being cancelled. CMT/Nurse Gales noted on a list containing Grievant's name after taking blood that Grievant needed meds, and stated that they should have been ordered anyway because of the lockdown.

7. Grievant is being subjected to mistreatment, intentional infliction of mental dis-tress, emotional distress, and mental anguish, as a result of the deliberate indifference to his serious medical needs. Based on information and belief, both the CAO of Menard Corr. Ctr. and Director of IDOC are denying Grievant his examination, treatment and medications while on lockdown status. Such a policy, practice and custom is unconstitution-al. Grievant can die from not receiving his blood pressure medications. Change this policy.

### II. Unwarranted Invasion of Personal Information & Disclosure of Personal Information To An Inmate By Staff About Grievant's Fiancee Placed Her In Possible Danger Or An Substantial Possible Risk of Imminent Harm Or Injury Or Other Serious Or Irreparable Harm, Etc.

8. On or about February 27th & 28th, 2010 Grievant acquired knowledge that an employee here at Menard Corr. Ctr. came into possession of some personal information about Grievant's fiancee (a private citizen) and then communicated the information to another employee and that employee then communicated and/or provided the information to an inmate who is  or was confined here at Menard Corr. Ctr.

(Con't at Page 3)

Exhibit No. 2A

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE** (Continued)

9. On or about April 10th or 11th of 2010, the Grievant was able to confirm through his fiancee that the inmate did indeed know several individuals that Grievant fiancee knew. The names of the persons that Grievant's fiancee knew are a Darryl Griffin and Phelps family of Louisville, Kentucky.

10. Grievant's fiancee has indicated she wants to pursue legal action, and wants the staff involved to be fired; and to recover damages for the violations of her Civil Rights, rights under the Privacy Act. Grievant is joining his fiancee as a Plaintiff.

11. Grievant's fiancee may have been or has been placed in danger; and/or exposed to a substantial risk of imminent danger, and physical harm or possible death, as well as her family. Based on information and belief, the two staff members disclosed the personal information about Grievant's fiancee to this inmate in retaliation or for other unknown nefarious and/or ominous reasons, etc.

12. Grievant's legal investigations and research matters that his fiancee has been assisting him with may have or were compromised, thus constituting an interference with Grievant's right of access to the courts.

13. Grievant request and urges that the Chief Administrative Officer, Donald D. Gaetz to come by or direct one of his personal Administrative Assistants (Patty Barone or Julie Eggemeyer) to come to Grievant cell immediately to obtain the names of the two employees and name of the inmate involved, to prevent any investigations by IDOC from being compromised or jeopardized; and so other employees can't warn the two employees or inmate.

### III. Relief Being Requested

14. Grievant and his fiancee has been and/or is being subjected to mistreatment, intentional infliction of emotional distress, and mental anguish as result of the two employees acts and/or omissions.

15. Grievant realleges and incorporates ¶¶ 1 thru 7 as if fully alleged herein, and seeks $100.000(One Hundred Thousand) dollars in compensatory damages against each IDOC employee and Medical Contractor and contract employees of Wexford Health Sys/Sources; and $200.000 (Two Hundred Thousand) dollars in punitive damages against same.

16. Grievant and his fiancee, realleges and incorporates ¶¶ 8 thru 14 as if fully alleged herein, and seeks damages exceeding $50.000 (Fifty Thousand) dollars in compensatory damages; and punitive damages exceeding $50.000 (Fifty Thousand) dollars against the two IDOC employees involved.

17. Grievant request that he and his fiancee not be subjected to any forms of retaliation and mistreatment by the IDOC. Change policy mentioned at paragraph 7 above.

18. Grievant request to meet personally with IDOC Legal Counsel Randy Stauffer and CAO Donald D. Gaetz to discuss a possible resolution concerning matters set forth in ¶¶ 8 thru 14.

Respectfully Submitted,

/s/

Dwayne M. Woodson,      N1-134
Reg. No. N-10392
P.O. Box 711
Menard, IL 62259-0711

cc: file
    dmw/Replica
    dlk

3 of 3

Distribution: Master File; Offender                          Page 2                          DOC 0046 (Rev 3/2005)

Exhibit No. 2B

STATE OF ILLINOIS )
              ) ss:
COUNTY OF RANDOLPH)

### AFFIDAVIT OF MAILING/PROOF OF SERVICE/CERTIFICATE OF SERVICE

    I, Dwayne M. Woodson, first being duly sworn upon my oath depose
and states that I caused to be mailed the attached instant Addendume and/or
Amendment to original grievance of 12.16.10 due to omission of information,
to counselor James Alms on this December 16, 2010, by placing said grievance
in the prison internal mailing system at the Menard Corr. Ctr.

Dated: _____   /s/ _____

### VERIFICATION OF CERTIFICATION

    Under penalties as provided by law pursuant to Section 1-109 of the Code
of Civil Procedures the undersigned certifies that the statements set forth in
this instrument are true and correct except as to matters therein stated to
be on information and belief and as to such matters the undersigned certifies
as aforesaid that verily believes the same to be true.

Dated: _____   /s/ _____

Exhibit No. 2C

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

| Date: 12.16.10 | Offender: (Please Print) Dwayne M. Woodson | ID#: N-10392 |
|---|---|---|

| Present Facility: Menard Corr. Ctr. | Facility where grievance issue occurred: Menard Corr. Ctr. |
|---|---|

**NATURE OF GRIEVANCE:**

☐ Personal Property    ☐ Mail Handling    ☐ Restoration of Good Time    ☐ Disability
☒ Staff Conduct    ☐ Dietary    ☒ Medical Treatment    ☐ HIPAA
☐ Transfer Denial by Facility    ☐ Transfer Denial by Transfer Coordinator    ☒ Other (specify): Amendment and/or Addendum to original grievance of
☐ Disciplinary Report: ___/___/___    this same date, i.e., 12.16.10
Date of Report    Facility where issued

Note:    Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

AMENDMENT AND/OR ADDENDUM TO ORIGINAL GRIEVANCE

Brief Summary of Grievance: Grievant, Dwayne M. Woodson, Reg. No. N-10392 submits this grievance as an Amendment and/or Addendum to the original grievance prepared and submitted earlier this 12.16.10 date. In paragraph 7 I mistakenly omitted the last part to the first sentence. After ..."56 days", it should be "However, after coming off on 10.13.10 ~~a few hours later was placed back on lockdown until 11.16.10~~. Also, I omitted the claim of interference, impairment and denial of access to the courts, ~~legal, political and executive processes in the State of Illinois, and the United~~ States, etc., to establish claims of innocence and wrogfully convicted, in conjunction with paragraphs 11 & 12.
    These omissions are caused by the stroke and brain damage I have and problems I'm having, etc. Also, the double-celling of inmates in North 1 & 2, South-Lowers ~~and South Uppers is unconstitutional; and the inadequate cell space.~~ The failure to pass out ice every (2) two hours to chronic ill inmates is unconstitutional when it's extremely hot.

Relief Requested:    Correct the overcrowding of prisoners, and the relief mentioned at paragraphs 12 thru 14 for the violations of the 8th, 14th and 1st Amendments, etc.

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

X _____ Offender's Signature    N-10392    12 / 16 / 10
ID#    Date

(Continue on reverse side if necessary)

| **Counselor's Response (if applicable)** |
|---|

Date Received: ___/___/___    ☐ Send directly to Grievance Officer    ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

Print Counselor's Name    Counselor's Signature    Date of Response

| **EMERGENCY REVIEW** |
|---|

Date Received: ___/___/___    Is this determined to be of an emergency nature?    ☐ Yes; expedite emergency grievance
☐ No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

Chief Administrative Officer's Signature    Date

Exhibit No. 2D

Distribution: Master File; Offender    Page 1    DOC 0046 (Rev. 2/2005)
Printed on Recycled Paper

**OFFENDER'S GRIEVANCE**

| Date: 12.16.10 | Offender: (Please Print) Dwayne M. Woodson | | ID#: N-10392 |
|---|---|---|---|

| Present Facility: Menard Corr. Center | Facility where grievance issue occurred: Menard Corr. Ctr. |
|---|---|

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [x] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [x] Other (specify) Excessive lockdown policy; unconstitutional lockdowns for prisoner with serious medical needs.

- [ ] Disciplinary Report: _____ / _____ / _____
  Date of Report          Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: Grievant, Dwayne M. Woodson, Reg. No. N-10392 submits this grievance pursuant to Title 20 Adm. Code §504.810; IDOC A.D.04.01.114 Local Offender Grievance Procedures, seeking relief from the acts and/or omissions by employees of the IDOC, as well as contract employees of Wexford Health Sources, Inc., with regards to: 1) failure to provide high blood pressure medication needed to prevent a stroke, in violation of IDOC A.D.04.03.105 Chronic Illnesses; 2) retaliatory interference with the treatment process and treatment plan for high blood pressure; 3) failure by IDOC and Wexford administrators to take any action to prevent the interference and denial of treatment process for serious medical needs; 4) excessive lockdowns policy causing additional deterioration and injury to medical and chronic illness; 5) unconstitutional lockdown & housing policies for prisoners over the age of 45 with chronic illness and serious medical needs; 6) overcrowding condition resulting in the denial of adequate daily indoor and outdoor exercise, and out of cell time; 7) the current and ongoing denial of any therapy and rehabilitation needed as a result of the 10.21.10 stroke I suffered; and 8) unconstitutional exposure to excessive heat conditions that exacerbated my deteriorating medical condition, causing a stroke due to the lenghty denial of medication, all in violation of Grievant's Civil Rights, 8th Amendment Rights, under both the Illinois and U.S. Constitutions.

(See Opposite Side)

Relief Requested: Correct the overcrowding of prisoners, and the relief mentioned at paragraphs 12 thru 14.

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Offender's Signature | N-10392 | Date |
|---|---|---|

(Continue on reverse side if necessary)

RECEIVED
JAN 2 4 2011
GRIEVANCE OFFICE
MENARD CORRECTIONAL CENTER

**Counselor's Response (If applicable)**

Date Received: 12. 21. 10

- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: See attached response from the Nursing Supervisor.

| James Alms CCII | | 1. 11. 11 |
|---|---|---|
| Print Counselor's Name | Counselor's Signature | Date of Response |

**EMERGENCY REVIEW**

Date Received: _____

Is this determined to be of an emergency nature?
- [ ] Yes; expedite emergency grievance
- [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

| Chief Administrative Officer's Signature | Date |
|---|---|

Exhibit No. 2E

Oct 16 2012  10:23 AM

**OFFENDER'S GRIEVANCE** (Continued)

1. Grievant is an African American prisoner with hypertension/high blood pressure, a chronic illness. On 10.21.10 I suffered an injury, a stroke and was taken by helicopter to St. Louis University Hospital, in St. Louis, Missouri where I remain intensive care until 10.23.10.

2. Grievant alleges and now contends his stroke/injury was caused by a combination of factors involving staff misconduct, IDOC policies, excessive lockdowns and other conditions of confinement that caused me to suffer a stroke.

3. Since December 2007 I have experienced extreme delays in receiving medications to treat high blood pressure.

4. In April 2010, during a lenghty lockdown I did not receive several medication for 20-days, and did not receive the Enalapril Maleate (Vasotec) for 50-days. A grievance was submitted on 4.19.10 for the denial of medication between 4.3.10 thru 4.19.10, however, a response was never received. Did not receive Vasotec from 6.25.10 thru 7.17.10, for 23-days.

5. Initially, I was lead to believe by CMT/Nurse J. Kennedy on 4.8.10 and CMT/Nurse Nelson 4.9.10 that all call passes for health care were being rescheduled due to the lockdown.

6. On 12.14.10 while at the Health Care I learned that Maj. Inman cancelled all call line passes except for emergency medical situation in retaliation for the 3.7.10 assault on several staff in North 1 Cellhouse. On 12.14.10 while at the law library I received information from the Physicians Desk Reference (PDR) Guide To Prescription Drugs, revealing the importance of the medication, and danger of not taking the medication. The Metoprolol Tartrate, Enalapril Maleate, Amlodipine Besylate and hydrochlorothiazide must be taken to be effective and take several weeks to get the full benefit; they merely keeps blood pressure under control. The denial of the medication needed for treatment worsen my high blood pressure.

7. On 1.31.10 went on lockdown for 22-days; on 3.7.10 went on lockdown for 44-days; on 6.11.10 went on lockdown for 26-days, and on 8.22.10 went on lockdown for 56-days, These excessive lockdown are unconstitutional where older prisoners of the age of 45 who are not involved should not be on lockdown no more than 3-days; and should receive outdoor and indoor exercise everyday or every other day. These prolonged lockdowns where prisoners with chronic illnesses are denied adequate exercise are unconstitutional. These lockdown worsen and exacerbated my deteriorating condition along with the denial of medication & overcrowding.

8. On July 22, 23, 24, 28 & 29 of 2010; and August 2, 3, 4, 9, 10, 11, 12, 13, 14, 15, 19 & 20 of 2010 the heat index was high outdoor. In the cell the temperatures was at least 15° higher, as high as 134°, which worsen and exacerbated my deteriorating health from denial of medication for blood pressure. I felt like I was going to die and couldn't get deep breaths.

9. Since being release from the hospital I have not received any therapy and rehabilitation needed as a result of the 10.21.10 stroke. I'm having problems with my right hand, right foot, right fingers and toes, and weakness on the right side of my body.

10. Dr. Krieg, Dr. Fahim, Nikki Malley, R. Pollin, Dr. Shicker, Rodger Walker, Gladys Taylor, S. Nwabasi, D. Gaetz, Maj. Inman, W. Rhyea, D. Redhour, J. Kennedy, CMT Nelson and Wexford employees are all responsible by failing to action, and for the policies causing my stroke. Grievant believes there are other responsible but have not been able to identify them. Others like former Director M. Randle, etc.

11. I'm experiencing a number of emotional disturbances such as anxiety, frustration, sleep deprivation. I have learned that there is a 35% chance I will have another stroke and I'm in constant fear that I will die. I have not been able to focus on my legal matters and my hand is hard to open if closed. My toes on my right foot can barely move. I feel hopelessness about all types of things, and my thought process just goes blank while I'm in the middle of talking or thinking. I have problem with talking without struggling to speak some time. I can not write for no more five-minutes before having difficulties trying to control and hold the pen where I must stop for a while and start again. There is something wrong with my head. Everything isn't right with my head and brain. The current policies and customs of denying me and other prisoners over the age of 45 with chronic illness indoor & outdoor exercise every day is not constitutional because it does allow us to maintain good health. Does not allow us to stay health.

12. Grievant seeks compensatory and punitive damages for mistreatment, deliberated indifference, intentional infliction of mental distress, emotional distress, and mental anguish, pain and suffering; future cost for therapy & rehabilitation; cost for hiring an attorney to assist me with ongoing legal matters and other legal expensives, etc.

13. Grievant seeks an Administrative Directive by the IDOC that allows outdoor and indoor exercise for all prisoners with chronic illness over the age of 45; and a separate housing units where we will not be affected during lockdowns; and seeks a policy that allows call line passes to be honored for the health care when on a lockdown; and seeks therapy & rehabilitation needed because of the stroke.

14. Grievant submits this grievance pursuant to Title 20 Adm.Code §504.810, and Illinois Supreme Court rules.11 & 12 consistent with Ch. 735 ILCS §1-109 of the Code of Civil Procedures with an attached Affidavit of Mailing & Proof of Service. A replica of both, the grievance and said affidavit of mailing & proof of service has been prepared by grievant for his file and copy.

Respectfully Submitted,

Dated: 12-16-10

Dwayne M. Woodson, N1-134
Reg. No. N-10392
P.O. box 711
Menard, IL 62259-0711

cc: file
     dmw
     Replica

Exhibit No. 2F

STATE OF ILLINOIS )
                 ) ss:
COUNTY OF RANDOLPH )

## AFFIDAVIT OF MAILING/PROOF OF SERVICE/CERTIFICATE OF SERVICE

    I, Dwayne M. Woodson, first being duly sworn upon my oath depose and states that I caused to be mailed the attached instant grievance to counselor James Alms on December 16, 2010, by placing said grievance in the prison internal mailing system at the Menard Corr. Ctr.

Dated: _12-6-10_      /s/ _____

## VERIFICATION OF CERTIFICATION

    Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure the undersigned certifies that the statement set forth in this instrument are true and correct except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that verily believes the same to be true.

Dated: _12-16-10_      /s/ _____



Exhibit No. 2G



**Illinois**
Department of
**Corrections**

Pat Quinn
Governor

Gladyse C. Taylor
Acting Director

Menard Correctional Center
711 Kaskaskia Street
Menard, IL 62259

Telephone: (618) 826-5071
TDD: (800) 526-0844

## MEMORANDUM

**Date:**   January 10, 2011

**To:**   Woodson, Dwayne
N10392

75-1-11

**From:**   Gail Walls, RN
Nursing Supervisor

**Subject:**   Grievance dated 12/16/10

Upon review of your medical records and Health Care Unit assignments I offer the following:

The health care unit doesn't control lock-down policy, yard privileges, population housing issues such as overcrowding or temperature control.

You are being followed in chronic illness clinic and medication as ordered. If you ever don't receive medication, have an issue, or are running low on medication; please put in for sick call to let the health care unit know you have an issue.

I didn't find any sick call request in your chart since before 2/13/09.

Gail Walls, RN
Nursing Supervisor

Cc.   Grievance file
Grievance Office



Exhibit No. 2H

Oct 16 2012   10:23 AM

STATE OF ILLINOIS   )
                    ) ss:
COUNTY OF RANDOLPH  )

### AFFIDAVIT OF MAILING/PROOF OF SERVICE/CERTIFICATE OF SERVICE

I, Dwayne M. Woodson, first being duly sworn my oath depose and states that I caused to be mailed the attached grievance of December 16th, 2010; attached affidavit of mailing, etc., of December 16th, 2010, and attached memorandum of Gail Walls, RN Nursing Supervisor, to Jeanette Cowan, the Greivance Officer on January 21st, 2011, by placing said grievance in the prison internal mailing system at the Menard Corr. Ctr., P.O. Box 711 Menard, IL 62259-0711.

Dated: ___1-21-11___        /s/_____

### VERIFICATE OF CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure the undersigned certifies that the statement set forth in this instrument are true and correct except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that verily believe the same to be true.

Dated: ___1-21-11___        /s/_____

Subscribed and Sworn to before me
on this __21__ day of January 2011

/s/_____
      Notary Public

OFFICIAL SEAL
TIM SAPP
Notary Public - State of Illinois
My Commission Expires Mar 22, 2014



Exhibit No. 2I

ILLINOIS DEPARTMENT OF CORRECTIONS
## RESPONSE TO OFFENDER'S GRIEVANCE

| Grievance Officer's Report |
|---|

Date Received: January 26, 2011        Date of Review: January 28, 2011        Grievance # (optional): 75-1-11

Offender: Woodson                                                              ID#: N10392

Nature of Grievance:  Medical treatment

Facts Reviewed:  All information submitted to the Grievance Officer by the offender or institutional staff pertaining to this issue(s) being grieved has been thoroughly reviewed. Offender grieves multiople issues dealing with health care and administrative policy and procedures.

On 1-11-11 counselor responded see attached response from the nursing supervisor

Grievance officer notes the memo from hcu (seeattached) states :" The health care unit doesn't control lock-down policy, yard privileges, population housing issues such as overcrowding or temperature control.  You are being followed in chronic illness clinic and medication as ordered.  If you ever don't receive medication, have an issue, or are runnin low on medication; please put in for sick call to let the health care unit know you have an issue. I didn't find any sick call request in your chart ince before 2-13-09."

Also note that only issues within the last 60 days will be addressed.  The issues of lock-down, yard, population housing issues such overcrowding or temperature control are administrative decisions and no merit.  Your health care issues are being addressed.

Recommendation:  Based upon a total review of all available information, it is the recommendation of this Grievance Officer that the inmate's grievance be denied.

_____        _____
Jeannette Cowan                          Grievance Officer's Signature
Print Grievance Officer's Name
(Attach a copy of Offender's Grievance, including counselor's response if applicable)

| Chief Administrative Officer's Response |
|---|

Date Received: January 31, 2011        ☑ I concur        ☐ I do not concur        ☐ Remand

Comments:

_____                                          1-31-11
Chief Administrative Officer's Signature                              Date

| Offender's Appeal To The Director |
|---|

I am appealing the Chief Administrative Officer's decision to the Director.  I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

_____                           _____        _____
Offender's Signature                                   ID#          Date

Exhibit No. 2J

IN THE

ILLINOIS DEPT. OF CORRECTIONS

DWAYNE M. WOODSON
_____
Plaintiff.

                            )
                            )
                            )
                            )   Case No. _____
            Vs.             )   GRIEVANCE No. 75-1-11
                            )
I DOC                       )
_____
Defendant

---

## NOTICE OF FILING/CERTIFICATE OF SERVICE

TO: IDOC/ARB                          TO: _____
ADMINISTRATIVE REVIEW BOARD           _____
P.O. BOX 19277                        _____
SPRINGFIELD, IL 62794-9277            _____

TO: _____                   TO: _____
_____                       _____
_____                       _____

PLEASE TAKE NOTICE that on FEB. 18, 2011. I have placed the documents listed
below in the institutional mail at MENARD        Correctional Center, properly addressed
to the parties listed above for mailing through the United States Postal Service: APPEAL
TO REVIEW OF GRIEVANCE, ATTACHMENTS & GRIEVANCE OFFICERS
REPORT PURSUANT TO §504.850(9)(d) OF THE TITLE 20 ADM
CODE.

DATED: 2.18.11            /s/ _____
                          Name: DWAYNE M WOODSON
                          IDOC#: N10392
                          Address: P.O. BOX 711
                                   MENARD, IL 62259-0711

OFFICIAL SEAL
JENNIFER CLENDENIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES
10/5/2013

RECEIVED
MAR - 3 2011

Subscribed and sworn to before me on this 18th day of _____ 20 ___

_____
Notary Public

Exhibit No. 2K

ILLINOIS DEPARTMENT OF CORRECTIONS

### Administrative Review Board
### Return of Grievance or Correspondence

Offender:  _Woodson_    _Dwayne_    — _N10392_
        Last Name          First Name        MI        ID#

Facility:  _MEN_

☒ Grievance: Facility Grievance # (if applicable) _75-1-11_ Dated: _1/31/11_   or ☐ Correspondence: Dated: _____

Received: _3 / 3 / 11_  Regarding: _Medical_
        Date

---

The attached grievance or correspondence is being returned for the following reasons:

**Additional information required:**

☐ Provide a copy of your written Committed Person's Grievance, DOC 0046 including the counselor's response if applicable).

☐ Provide a copy of the Committed Person's Grievance Report, DOC 0047, including the Grievance Officer's and Chief Administrative Officer's response, to appeal.

☐ Provide date(s) of disciplinary report(s) and facility where incident(s) occurred.

☐ Unable to determine nature of grievance or correspondence; submit additional specific information.  Please return the attached grievance or correspondence with the additional information requested to:  Administrative Review Board
    Office of Inmate Issues
    1301 Concordia Court
    Springfield, IL  62794-9277

**Misdirected:**

☐ Contact your correctional counselor regarding this issue.

☐ Request restoration of Good Conduct Credits (GCC) to Adjustment Committee.  If request is denied by the facility, utilize the inmate grievance process outlined in Department Rule 504 for further consideration.

☐ Contact the Record Office with your request or to provide additional information.

☐ Personal property issues are to be reviewed at your current facility prior to review by the Administrative Review Board.

☐ Address concerns to:  Illinois Prisoner Review Board
    319 E. Madison St., Suite A
    Springfield, IL  62706

**No further redress:**

☐ Award of Meritorious Good Time (MGT) and Statutory Meritorious Good Time (SMGT) are administrative decisions; therefore, this issue will not be addressed further.

☒ Not submitted in the timeframe outlined in Department Rule 504; therefore, this issue will not be addressed further.

☐ This office previously addressed this issue on _____ / _____ / _____
                                                    Date

☐ No justification provided for additional consideration.

Other (specify): _R 4/15 more than 31 days part (AB) Regulation dt 74_

Completed by: _Brian Fairchild_          _Brian Fairchild_ (signature)       _3/14/17_
              Print Name                   Signature                          Date

Distribution:  Offender; Inmate Issues

Exhibit No. 2L

DOC 0070 (10/2001)
(Replaces DC 710-1274)

Oct 16 2012   10:23 AM

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Authorization for Payment

Posting Document # _____  Date _____

Offender Name _____  ID# _____  Housing Unit _____

Pay to _____

Address _____

City, State, Zip _____

The sum of _____ dollars and _____ cents charged to my trust fund

account, for the purpose of _____

☐ I hereby authorize payment of postage for the attached mail. ☐ I hereby request information on electronic
funds transfers to be placed in the attached mail.

Offender Signature _____  ID# _____

Witness Signature _____

☐ Approved  ☐ Not Approved   Chief Administrative Officer Signature _____

Postage applied in the amount of _____ dollars and _____ cents.

Distribution: Business Office, Offender, Mail Room

*Printed on Recycled Paper*

DOC 0296 (Eff. 1/2006 )
(Replaces DC 826)



Exhibit No. 2M

Oct 16.2012   10:23 AM

<u>2010 MENARD CORRECTIONAL CENTER LOCKDOWN DATES</u>

January 30 No Yard due to weather; 31 (West Cellhouse Incident)
          until February 21

February 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16,
          17, 18, 19, 20, 21

March 7    North-1 Cellhouse 6 gallery Incident) 8, 9, 10, 11, 12,
          13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26,
          27, 28, 29, 30, 31 until April 19

April      1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16,
          17, 18, 19

June 11 (South-Lower Cellhouse Incident) 12, 13, 14, 15, 16, 17,
          18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 until
          July 6

July       1, 2, 3, 4, 5, 6; 27 (East & West Cellhouse Shakedown)

August 22 (North-1 Cellhouse Incident on Yard w/Lt. Trouville) 23,
          24, 25, 26, 27, 28, 29, 30, 31 until October 12

September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17,
          18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, until
          October 12

October 13 (Came off this date but went back on lockdown a few hours
          later) 14, 15, 16, 17, 18, 19, 20, 21 (Suffered stroke on
          10.21.10) 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 until
          November 15

November 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15

December 2; 16 (Ice/Weather)


<u>NOTE</u>: 310-days between January 30 & December 16
      181-days of Lockdowns
       34-days of an opportunity for exercise, etc




                    Exhibit No. 3

## 2011 MENARD CORRECTIONAL CENTER LOKDOWN DATES

Jan.    14, 15

Feb.    2, 3, 4; No yard on the 5th

Mar.    (None)

Apr.    11th 1-hour 15-min; 12, 13, 14, 15, 16, 17, 18, 19, 20
        21, 22, 23, 24, 25, 26, 27, 28, 29, 30

May     1, 2, 3, 4, 5, 6, 7, 8

June    8, 9, 10, 11, 12; 18, 23, 24, 25, 26, 27; 29-30

July    1st thru 20; 22 for 5½ hrs; 28, 29, 30, 31

Aug.    1 thru 23

Sept.   1 thru 22

Oct.    25, 26

Nov.    None

Dec.    None

**NOTE:** These dates of lockdown were recorded while being housed
        in North One while under unassigned status. **Total 118-days.**

Exhibit No. 3A

## 2012 MENARD CORRECTIONAL CENTER LOCKDOWN DATES

Jan.    6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16

Feb.    7, 8, 9, 10, 11, 12, 13, 14, 15 WCH S/Assualt; 25, 26, 27
        28, 29 ECH Yard Incident

Mar.    1, 2, 3, 4, 5, 6; 19, 20, 21 WCH Dinning Room Incident

Apr.    6, 7

May     16, 17, 18, 19, 20, 21, 22 Three Incidents

June    3rd thru 24th WCH Incident

July    19th One Hour; 27, 28, 29, 30, 31

Aug.    1, 2, 3, 4, 5;  11, 12, 13, 14; 20th, 27, 28, 29, 30, 31

Sept.   1st thru 24th

Oct.    6, 7, 8, 9, 10, 11, 12, 13, 14, 14;  26, 27, 28, 29, 30,
        31

Nov.    1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12

Dec.    14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24; 26th, 29, 31

NOTE:   The dates between August 29th through October 5th were
        recorded while being housed in the ECH. **Total 147-days.**

Exhibit No. 3B

# NeuroAiD™

## Stroke is the first cause of acquired disability in the world

A stroke, brain attack, or a Cerebrovascular Accident (CVA), is the sudden death of brain cells caused by a lack of supply in oxygen to the brain. There are two main types of stroke:



- Ischemic strokes or cerebral infarcts (80% of strokes) result from a blockage or a reduction of blood flow in an artery that irrigates the brain. They are caused either by a blood clot (thrombus) which blocks the blood vessel or by the buildup of plaque (often due to cholesterol) within the arteries which narrows vessels resulting in a loss of blood flow.

- Haemorrhagic strokes are due to the rupture of an artery within the brain triggering an intracerebral haemorrhage (15% of strokes) or to the rupture of an aneurysm (arteriovenous malformation) entailing subarachnoid haemorrhage (5% of strokes).

## What are the consequences of a stroke?

Resulting disabilities will vary depending on stroke location and severity.

After a stroke, brain cells die in the affected areas resulting to damaged or even lose neurons. Patients will often suffer physical disabilities such as partial loss of motricity or hemiplegia, sensory loss, language disorders, aphasia, visual disorders, and even memory loss. Level of recovery will vary from patient to patient. Starting rapidly a rehabilitation program is key to recovery.

## Is there anything to boost recovery?



NeuroAiD™ is a recovery stimulator dedicated to support neurological functions*.

NeuroAiD™ recovery stimulator has been shown to increase the production of new neurons in the brain and supports the formation of new connections. The effects of this favorable brain environment have been shown to improve the outcome of recovery in clinical trials: patients on NeuroAiD™ have a 2.4 times higher chance of reaching independence**.

*Find out if NeuroAiD™ is right for you*

* This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent disease.
** Clinical study published in peer reviewed journal "Stroke". Reference: Stroke, 2009 Mar;40(3):859-63.

Exhibit No. 4

| ENGLISH | FRANÇAIS | ESPAÑOL

[Search]

**Contact our Customer Care:**
1-800-882-4046 (US Toll Free)
1-800-037-942 (Australia Toll Free)
or +65-6478-9434 (Singapore direct line)

**Home    Who Should Take NeuroAiD™?    Why Take NeuroAiD™?    Getting Started    Order NeuroAiD™**

Home » Who Should Take NeuroAiD™?

Search...        Search

### After a Stroke

# NeuroAiD™, the treatment for stroke patients

NeuroAiD™ (MLC 601) is a natural medicine indicated for post-stroke rehabilitation. NeuroAiD™ offers a new solution to support stroke sufferers in achieving better neurological and functional recovery.

During stroke recovery, you will be relearning and regaining skills to be as independent as possible. Since your potential to recover will diminish over time, the earlier the right rehabilitation program is initiated, the greater chance you have to recover lost functions.



### If you start taking NeuroAiD™

- **Less than six months after the stroke onset:**

During this favorable period for recovery, most patients achieve visible progress each month. Clinical trials established that patients taking NeuroAiD™ achieved a significantly better recovery:

Recovering independence: Patients taking NeuroAiD™ more than double their chances to recover independence (by 2.4 times) compared with patients not taking NeuroAiD™.

Reducing disabilities: Patients treated with NeuroAiD™ recover on average 70% of their motor deficits versus 43% for patients not treated with NeuroAiD™. Patients with visual deficits such as homonymous hemianopsia have also shown to recover a further 12% of their visual field on average.

To ensure best results, NeuroAiD™ should be taken together with intense physical therapy.

- **Six months after the stroke onset and beyond:**

By this time, many patients may feel left to cope with very slow progress, if any. Yet, experience has shown that adding NeuroAiD™ to the patients' rehabilitation program can still provide significant improvement and relief.

Many patients tried NeuroAiD™ more than six months after their stroke and reported reduced spasticity and significant improvement in their motor skills, speech, walking, and vision after completing the treatment.

- **Stroke prevention and other neurological diseases:**

NeuroAiD™ has not been studied clinically on other indications, but both in vitro and animal testing indicated a prolongation of the life span of neurons against natural aging and further protection against external events. It has also been shown that the surviving neurons are stronger and healthier.

Given its excellent safety profile, we are planning more studies on NeuroAiD™ to evaluate its potential role in slowing down cognitive decline, including Alzheimer's disease and other neurodegenerative diseases and possibly as an add-on to stroke prevention treatment. This research began in 2012 and will continue this year and beyond.

To receive personal advice on our stroke treatment, please fill up our form and a product specialist will get back to you.

If you want to know how other patients rated their experience with the NeuroAiD™ treatment, please read our NeuroAiD™ patient survey report by clicking here.

ke   1.3k              Share

Last Updated on Thursday, 10 May 2012 15:32

**Get Personalized Advice**

Find out if NeuroAiD™ is right for you
**ASK YOUR QUESTIONS**

**FILL OUT OUR INQUIRY**

**Patient Testimonials**



Find out stories of stroke victims worldwide who have already regained substantial or complete neurological function using the NeuroAiD medication.

[Read more]

### How does NeuroAiD™ work?



NeuroAiD™ stimulates key mechanisms of recovery in your brain. It connects and protects neurons in damaged areas and creates a favorable environment for stroke recovery.

[Read More]

### Information for Medical Professionals

Learn how NeuroAiD can help stroke survivors. Review essential medical data, read about our research, ongoing clinical trials and publications.

[Read More]

### NeuroAiD™ patient survey report 2012

We surveyed patients who purchased NeuroAiD™ online. Read how they rate their overall experience

[Read More]

Exhibit No. 4A

Search

| ENGLISH | FRANÇAIS | ESPAÑOL

Contact our Customer Care:
1-800-882-4046 (US Toll Free)
1-800-037-942 (Australia Toll Free)
or +65-6478-9434 (Singapore direct line)

**Home**   Who Should Take NeuroAiD™?   Why Take NeuroAiD™?   Getting Started   Order NeuroAiD™

Home



Search...   Search

## Time is Crucial in Stroke Recovery

A stroke or cerebrovascular accident is a sudden disruption of blood supply in the brain that deprives neurons of oxygen and glucose. As a consequence, brain cells die in the affected areas, leaving stroke victims with motor and cognitive disabilities.

NeuroAiD™ is a natural oral treatment dedicated to **stroke recovery and stroke rehabilitation**.

First visit? Take a 3-minute tour to discover NeuroAiD™



**Get Personalized Advice**

Find out if NeuroAiD™ is right for you
**ASK YOUR QUESTIONS**

**FILL OUT OUR INQUIRY**

NeuroAiD™ stroke treatment has been shown to increase the production of new neurons in the brain and supports the formation of new connections.

The effects of this favorable neuroplasticity environment have been shown to improve the outcome of recovery in clinical trials: patients on NeuroAiD™ have a 2.4 times higher chance of reaching independence*. This treatment is safe and has no known drug interaction.

Since 2006, NeuroAiD™ has been used by over 20,000 patients throughout the world to recover from a stroke. NeuroAiD™ acts as a recovery booster, decreasing dependence on caregivers, reducing burden for the family, and enabling patients to resume more activities. Please visit our **stroke patients and testimonial.**

*Clinical study published in peer reviewed journal "Stroke". Reference: Stroke. 2009 Mar;40(3):859-63. For more clinical information please visit NeuroAiD's clinical data section.

**Patient Testimonials**



Find out stories of stroke victims worldwide who have already regained substantial or complete neurological functions using the NeuroAiD medication.

Read More |

**NeuroAiD™ patient survey report 2012**

We surveyed patients who purchased NeuroAiD™ online. Read how they rate their overall experience

Read More |

**Information for Medical Professionals**

Learn how NeuroAiD™ can help stroke survivors. Review essential medical data, read about our research, ongoing clinical trials and publications.

Read More |

**Follow us**

About Us | Press Releases | Distributors | Terms and Conditions | Privacy Policy | Stroke questions | Blog | Contact us

Copyright © 2003-2013 . All Rights Reserved NeuroAiD™ by Moleac Pte Ltd, Helios #09-07 - 11 Biopolis Way - 138667 SINGAPORE
All Internet orders are secured and processed using SSL. Shipping is handled by FedEx or SingPost according delivery adresses from the Republic of Singapore.
NeuroAiD™ is marketed by Moleac Pte Ltd www.moleac.net This site does not accept any advertisement from third parties except links exchange with few selected websites Links

Exhibit No. 4B